*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUAN JOSE DEL CID,

        Defendant-Appellant.

FOR PUBLICATION
February 27, 2020
9:00 a.m.

No. 342402
Ottawa Circuit Court
LC No. 16-040357-FC

ON REMAND

Before: SHAPIRO, P.J., and BORRELLO and BECKERING, JJ.

SHAPIRO, P.J.

Following a jury trial, defendant was convicted of two counts of first-degree criminal sexual conduct (CSC-I) against AC, the daughter of his longtime girlfriend. On appeal, we affirmed defendant's convictions.[1] Defendant then appealed to the Supreme Court, which vacated our judgment in part and remanded for reconsideration[2] in light of *People v Harbison*, the companion case to *People v Thorpe*, 504 Mich 230, 235; 934 NW2d 693 (2019).[3] There, the Court held "that examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury." *Id.* 235. The question in this case is whether an examining physician may testify to a "diagnosis" of "possible pediatric sexual abuse" in the absence of supporting physical findings. We conclude that *Harbison* and the

---

[1] *People v Del Cid*, unpublished per curiam opinion of the Court of Appeals, issued May 21, 2019 (Docket No. 342402).

[2] *People v Del Cid*, ___ Mich ___ (Docket No. 159848) (2019).

[3] The first case name in the caption of these consolidated cases is *People v Thorpe*. Since the Supreme Court order referred us to *People v Harbison* and our discussion largely focuses on that case, we will refer to the case as *Harbison*.

cases it relied on bar such testimony and because we cannot say that this error was harmless, we reverse defendant's convictions and remand for a new trial.

AC lived in a two-bedroom apartment with her siblings, her mother (Nelly) and her mother's boyfriend, defendant. Defendant and Nelly have three children together, and Nelly has two children of her own, including AC. AC refers to defendant as her "step-dad."

The allegations arose in June 2016, when AC was 14 years old. AC had been caught stealing by her aunt and mother, who was angry. After her mother fell asleep, AC decided to go to a weeknight church service through the church's "bus ministry" because she did not want to be home. According to AC, while at church a friend asked her if she was virgin, to which she responded she was not. AC testified that, by way of explanation, she mentioned her boyfriend and told her friend that "my step-dad was doing this stuff," referring to the allegations of sexual abuse. When the church bus was returning the teenagers home, AC requested to be dropped off last because she did not want to go home. She testified that the "main reason" was that her mother was mad at her. When AC's friend left the bus, she whispered something to bus driver, who then announced that he could not return AC to her home. A chaperone then began questioning AC, who responded that her step-dad was "molesting" her.

The police were contacted and interviewed AC that night. About a week later, AC underwent a forensic interview and the police interviewed defendant, who denied the allegations. The next day defendant was arrested and charged with one count of CSC-I. He was bound over following a preliminary examination, and the information charged him with sexual penetration by a person 17 years of age or older against an individual less than 13 years of age, MCL 750.520b(2)(b), and sexual penetration of a person who is at least 13 but less than 16 years of age by a member of the same household, MCL 750.520b(1)(b)(*i*).

At trial, AC testified that the first incident of abuse occurred when she was eight years old. She stated that one day when she and the other children were playing with defendant, he slid his hand down her pants. She was not sure whether defendant touched her on top of or underneath her underwear, but she was certain that defendant touched her vaginal area. AC told her mother about this incident shortly after it occurred. Nelly asked AC to repeat her allegations in front of defendant, but AC said that she did not feel comfortable doing so. Defendant told Nelly that he was "just playing around" and tickling the victim, and AC agreed with defendant's story "to get it over with" and because she was scared of getting in trouble.

According to AC's testimony, the next incident occurred when she was 12 years old. She testified that defendant picked her up, carried her into his bedroom and took off her pants. AC stated that when she realized what defendant was doing, she began crying and told him that she did not want to have sex with him because she did not want to get pregnant. AC asserted that defendant said it was okay because he had a condom. She testified that defendant then had sexual intercourse with her, which was "very painful." She further testified that she then went to the bathroom and discovered she was bleeding. She said that she told defendant about the bleeding and that he simply looked at her and walked away.

AC testified that defendant had sex with her two to three times a week after she turned 13 and that it was so often that she came to see it as "a normal thing." She testified that she did not

tell her mother about what was going on; the only incident she ever revealed to her mother was the one that occurred when she was eight years old. AC's mother worked nights and defendant cared for the children while she was working. AC testified that usually the other children were at home when defendant would have sexual intercourse with her, but they never witnessed it because they were always either asleep or in another room playing games when it occurred. She also testified that there were a few times when defendant had sex with her while her mother was in the shower getting ready for work. She also recalled defendant having sex with her while her youngest brother, then a baby, was asleep in the same bed.

Dr. Debra Simms, M.D., performed the medical evaluation of AC following disclosure of the allegations and was admitted as an expert in "child abuse pediatrics" at trial. Before she conducted a physical examination of AC, Dr. Simms obtained a history from her mother; the nurse obtained a history from AC. The nurse relayed to Dr. Simms that AC alleged penile-vaginal contact and penile-digital contact while she was between the ages of 12 and 14 and that there had been pain and bleeding after the first penile-vaginal contact. Dr. Simms then performed a physical examination, which revealed no signs of sexual abuse. Dr. Simms diagnosed AC with "possible pediatric sexual abuse." She gave the following explanation for her opinion:

Q. Okay. I want to focus on kind of the genital area regarding the physical examination. Did you ultimately form an opinion in this case after doing the physical examination?

A. Yes, I did.

Q. What was your opinion?

A. I made a medical diagnosis, based upon the history and the physical examination, and I diagnosed her with possible pediatric sexual abuse.

Q. Why is that?

A. The history was given that there had been penile/vaginal contact, that there had been contact to her hand, obviously, when you look at a hand, you're not going to see a penis print or anything like that, so you're going to have a normal exam. [AC], in–as part of our history, we're very specific, [AC] had actually started her menstrual period when she was 12 years of age. [AC] was also reported to use tampons. So, as part of the history, I knew that there was an object that was regularly going into the vaginal area, that I knew that her menstrual cycle had begun two-and-a-half years prior to my examination. The changes that occur with puberty adapt a child, even though we don't want children becoming sexually active at that age . . . . But, the body, from the fact that it is regulating and having menstruation and whatever the potential is there at that time. So, there are physical changes that occur to the body. . . . You go from birth, which is one, to fully mature, you're not going to get any more developed is five. . . . So, in looking at her body, she was a sexual maturity five of the genital area. . . . So, the–the opening to the vagina is there, and in front of that opening is a piece of tissue called the hymen. . . . In the case of sexually mature young ladies, that tissue is the one that will really change.

. . . I've personally seen children before puberty and after puberty and it's night and day differences, because of those affects. [AC], when I'm examining her and looking at those tissues, she has what is called a petaled configuration. . . . That allows intrusion of a tampon or intrusion of something else without necessarily tearing the tissue. A lot of people believe that the first time you have sex that tissue has to tear. It doesn't have to, depending upon the shape and depending upon the sexual maturity rating of the individual. So, in [AC's] case, I found that she had this petaled configuration. So, her physical examination was normal. Her physical examination was normal. It neither confirmed nor ruled out her history given that there had been penile/vaginal contact. My diagnosis as a physician was based upon the history that was given, and that's what we do.

*Q.* So, based upon the history and the anatomical findings, if you will, it's possible that she was sexually abused.

*A.* It was possible that she was sexually abused, yes, sir.

*Q.* But, her medical evaluation was normal.

*A.* Her–her physical examination was normal, yes, sir.

*Q.* Is that abnormal?

*A.* It's normal to be normal.

*Q.* Okay. What do you mean by that?

*A.* There are actually–as I mentioned, there are a lot of people that think that the body, especially the hymen, is like a solid wall. . . . And they think that, for virgins, that that actually has to be broken the first time they have intercourse. That is not true. . . . So, because a lot of people believe certain things and there are myths about what the normal structures are, there has been research and there have been papers published. One of the papers that was published was called, "it's Normal to be Normal." They took 236 children that they wanted to look at their examinations and say, "If these children were abused, then what do their examinations look like," well, you come to the problem of whether or not you know if a child has been abused. So, what they did, is they took 236 children where there had been convictions . . . ; 77 percent of those children had normal or non-specific findings. So, even though we knew that someone had decided that they had been abused, it was normal to be normal. That was in a wide age range. Then, what they did, is they did another study in which they took 36 pregnant adolescents . . . . And so, of those 36 pregnant teenagers, all but two of them did not have definitive findings of penetration. So, that paper was actually titled, "Normal Does Not Mean Nothing Happened." So, when we say that it's normal to be normal, the human body, especially as it goes through puberty, is adapted to this kind of function, and– and it can occur with little or no damage to the body.

-4-

*Q.* So, ultimately, in conclusion, the findings that you found on [AC] were normal?

*A.* She was normal, yes, sir.

*Q.* And it's normal to be normal, that's–that's nothing that's abnormal?

*A.* That's nothing–I guess so.

*Q.* Did you follow that? She–it was normal to be normal, which is normal?

*A.* Yes.

On cross-examination, Dr. Simms confirmed that "there were no hematomas, no lacerations, no scars, nothing, that it was normal."

In addition to AC and Dr. Simms, the prosecution called as witnesses the bus chaperone and two other church members who spoke with AC the night of her disclosure. The forensic interviewer also testified as well as two police officers. Officer Jose Mendoza, who interviewed defendant following the allegations, testified that defendant denied sexually abusing or touching AC. Mendoza further testified that defendant told him that about two weeks prior AC had come into his bedroom late at night, jumped him and straddled her legs around his torso. Defendant said that he told her that was inappropriate but she did it four more times and then touched his "genital area" with her hands; defendant told her "not to do that."

The defense called numerous witness. AC's mother, Nelly, testified that she "never witnessed . . . anything out of the normal" between AC and defendant. Nelly also asserted that AC had lied to her "on many occasions" and she "started being very dishonest" once she began high school. Nelly believed that "something may have happened to [AC]," but she did not believe that defendant was the perpetrator. AC's sister, KC, testified that she lived in the same household as AC and defendant and did not recall ever seeing anything strange between them. KC did not think that she could trust her sister because of the "many lies that she has been telling." The defense's other witnesses testified to defendant's character. Defendant then testified and denied that he had ever had sex with AC or touched her in a sexual manner.

The jury deliberated for about an hour on the first day of deliberations. About midday on day two, they requested to listen to AC's and defendant's testimonies. An audio disc of the testimonies was prepared for the jury. They then deliberated for about two more hours before finding defendant guilty of the charged offenses.

On appeal, defendant argued, in part, that Dr. Simms vouched for AC's testimony in violation of *People v Smith*, 425 Mich 98; 387 NW2d 814 (1986). According to defendant, Dr. Simms's diagnosis of possible pediatric sexual abuse signaled her acceptance of AC's allegations. Defendant also argued that trial counsel was ineffective for failing to object to Dr. Simms's testimony. We rejected those arguments, reasoning that admission of the testimony was not plainly erroneous when Dr. Simms "did not state a finding of sexual abuse or even probable abuse." Given that, we concluded that Dr. Simms's testimony did not amount to impermissible vouching. We further concluded that any objection by trial counsel would have been futile and therefore

defendant was not denied effective assistance of counsel by the lack of an objection. *People v Del Cid*, unpublished per curiam opinion of the Court of Appeals, issued May 21, 2019 (Docket No. 342402), p 2.[4]

After our decision, the Supreme Court decided *Harbison*. In lieu of granting defendant's application for leave to appeal, the Supreme Court vacated the part of our judgment concerning Dr. Simms's testimony and remanded for reconsideration in light of *Harbison*. Having done so, we now conclude that an examining physician's testimony diagnosing a child-complainant with "possible sexual abuse" is inadmissible without corroborating physical evidence, that admission of Dr. Simms's testimony to that effect was plainly erroneous, and that reversal is required.

The Supreme Court has repeatedly overruled decisions permitting testimony from expert witnesses that has the effect of bolstering a child-complainant's testimony. See e.g., *People v Beckley*, 434 Mich 691, 727; 456 NW2d 39 (1990); *People v McGillen*, 392 Mich 278, 285; 220 NW2d 689 (1974). Even before *Harbison*, it was established that an examining physician could not opine that sexual abuse had occurred unless that opinion was supported by physical findings. In *Smith*, 425 Mich at 112, the examining physician testified to his opinion that the complainant had been sexually assaulted based "not on any findings within the realm of his medical capabilities or expertise as an obstetrician/gynecologist, but, rather, on the emotional state of, and the history given by, the complainant." The Supreme Court held that admission of this testimony was erroneous and required reversal. *Id*. at 113. In *Harbison*, the Court summarized the rationale for that holding:

> Citing MRE 704, we stated that "[i]t is . . . well-established that expert opinion testimony will not be excluded simply because it concerns the ultimate issue[.]" Yet, we acknowledged that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth." An examining physician's opinion is objectionable when it is solely based "on what the victim . . . told" the physician. Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor. Nonetheless, an examining physician, if qualified by experience and training relative to treatment of sexual assault complainants, can opine with respect to whether a complainant had been sexually assaulted when the opinion is based on physical findings *and* the complainant's medical history. [*Thorpe*, 504 Mich at 255.]

The *Harbison* defendant was convicted of, among other charges, two counts of first-degree criminal sexual conduct and two counts of second-degree criminal sexual conduct. *Id.* at 242-243, 249. At the defendant's trial, Dr. Simms testified that, following her examination of the complainant, TH, she diagnosed her with "probable pediatric sexual abuse." *Id.* at 244. Dr. Simms acknowledged that TH's physical examination was normal; it "did not show any acute or remote indications of trauma." *Id.* at 245. She also explained that she had not expected to find any

---

[4] We also rejected defendant's argument that his due-process rights were violated when, during voir dire, a potential juror stated that she was a victim of sexual abuse and described a situation that was similar to the facts of the present case. *Del Cid*, unpub op at 2-3.

indications of trauma given TH's descriptions of the alleged sexual contact. *Id.* at 244-246. She explained that a finding of probable pediatric sexual abuse is appropriate when there is a "clear, consistent, detailed, and descriptive" account of the abuse. *Id*. at 247-248.

The Supreme Court determined that Dr. Simms's testimony that TH suffered "probable pediatric sexual abuse" amounted to impermissible vouching:

> Dr. Simms candidly acknowledged that her examination of TH showed no physical evidence of an assault. Her conclusion that TH suffered "probable pediatric sexual abuse" was based solely on her own opinion that TH's account of the assaults was "clear, consistent, detailed and descriptive." This testimony clearly falls within *Smith*'s holding that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth." An examining physician's opinion is objectionable when it is solely based "on what the victim . . . told" the physician. Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor. [*Id*. at 261-262.]

The Court concluded that this error was obvious because "*Smith* was unanimous and has never been called into question," and it "provides a very straightforward bright-line test that trial courts can readily observe." *Id*. at 262. The Court then concluded that Dr. Simms's testimony that TH suffered probable pediatric sexual abuse affected the defendant's substantial rights. *Id.* at 263. The Court recounted its precedent establishing the prejudicial effect of expert vouching for a child-complainant's credibility:

> [W]e believe the most prejudicial aspect of Dr. Simms's testimony was that she clearly vouched for TH's credibility. This Court has previously drawn a distinction between expert testimony that a particular child was abused and testimony about the common characteristics of abused children:
>
> > Therefore, any testimony about the truthfulness of this victim's allegations against the defendant would be improper because its underlying purpose would be to enhance the credibility of the witness. To hold otherwise would allow the expert to be seen not only as possessing specialized knowledge in terms of behavioral characteristics generally associated with the class of victims, but to possess some specialized knowledge for discerning the truth.
>
> As we recognized in *Beckley* and embraced in [*People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995)]:
>
> > The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation— the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would

-7-

go unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary. To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat. [*Thorpe*, 504 Mich at 263-264.]

The Court then reiterated its view that Dr. Simms's testimony amounted to impermissible vouching and determined that this error was not harmless because the case was a credibility contest:

> [T]he Court of Appeals found no error in Dr. Simms's testimony, reasoning that Dr. Simms did not opine on whether [TH] was abused by [the defendant] but only diagnosed [TH] with "probable pediatric sexual abuse." We disagree. Regardless of whether "probable pediatric sexual abuse" is a term of art that can be used as a diagnosis with or without physical findings, we conclude that Dr. Simms's testimony had the clear impact of improperly vouching for TH's credibility.
>
> . . . [T]he instant case is largely a credibility contest. The only evidence against [the defendant] was TH's uncorroborated testimony. To bolster its case, the prosecution presented testimony from a pediatrician who is board-certified in child abuse pediatrics; who is currently a medical director at the Safe Harbor Children's Advocacy Center; who has examined, in her estimate, thousands of children that have been sexually abused; and who has testified as an expert witnesses [sic] in 32 counties. Given the lack of compelling testimony that forms the basis for the verdict and the plainly erroneous testimony that TH suffered "probable pediatric sexual abuse," we conclude that the plain error affected [the defendant's] substantial rights. [*Id*. at 264.]

The Court further concluded that this was far more than "a mere evidentiary error."

> Rather, this error strikes at the heart of several important principles underlying our rules of evidence. Dr. Simms's testimony that TH suffered "probable pediatric sexual abuse" based solely on TH's statements about her history not only had the effect of vouching for TH's credibility, but it also invaded the province of the jury to determine the only issue in the case. Then, Dr. Simms reinforced this plain error by claiming that her diagnosis was based on a "national [consensus]" of pediatricians when even a cursory review of the article on which she relies reveals that the authors did not intend for pediatricians to rely on the article to make a diagnosis of "probable pediatric sexual abuse" at trial. This improperly admitted testimony very likely bolstered TH's credibility and affected the verdict. We conclude that the gravity of this significant error seriously affected the integrity of Harbison's trial. [*Id*. at 264-265.]

The Court reversed this Court's judgment affirming the defendant's convictions and remanded to the circuit court for a new trial. *Id.* at 266.

*Harbison, Smith* and the cases on which they relied establish a bright-line rule that an examining physician's opinion that a complainant was sexually abused is admissible only if supported by physical findings. Dr. Simms's testimony is contrary to that caselaw because, despite the lack of any physical evidence of abuse, she diagnosed AC with possible pediatric sexual abuse. In the absence of physical findings, it necessarily follows that the physician's opinion is solely based on her assessment of the complainant's statements. The Supreme Court could not have been clearer that such testimony is inadmissible because it invades the jury's province to determine witness credibility. See *id*. at 262.

The question then is whether Dr Simms's otherwise inadmissible testimony should be allowed in this case because she testified that AC was possibly, rather than probably, sexually abused. We conclude that this is a distinction without a meaningful difference. "Possible pediatric sexual abuse" is not significantly different from "probable pediatric sexual abuse" in terms of the physician's endorsement of the accusation. In both instances, the examining physician speaks to the likelihood of abuse in the absence of any physical evidence and couches it in terms of a medical diagnosis. This necessarily leads the jury to believe that the expert witness finds the complainant's account credible.[5] And were we to consider "possible sexual abuse" as significantly different from "probable sexual abuse" it would be inadmissible under MRE 403. Testimony that the "diagnosis" is merely "possible" has very little probative value while, for the reasons discussed in *Harbison*, such testimony is highly prejudicial.[6]

Indeed, *Harbison* strongly indicated that a "diagnosis" of sexual abuse made by a physician has no place at trial absent positive physical findings. As in this case, in *Harbison* Dr. Simms explained that the lack of supporting physical findings regarding the hymen did not mean that penetration had not occurred because its "normal to be normal." The Supreme Court stated that, to the extent that Dr. Simms's diagnosis was based on *Examination Findings in Legally Confirmed Child Sexual Abuse: It's Normal to be Normal*, 94 Pediatrics 310 (1994)—the same article she referred to in her testimony in the instant case—her reliance on it was "seriously misplaced." The Court explained:

> Relying on this article to testify at trial concerning whether a complainant suffered "probable pediatric sexual abuse" actually undermines the integrity of the study by proving the very premise that it accepts as true, i.e., that legally confirmed

---

[5] In *Harbison*, Dr. Simms testified that a diagnosis of possible pediatric sexual abuse is given if a child's "statement is limited," possibly because the child has a developmental disability, is young, or is unable to really communicate what happened. *Thorpe*, 504 Mich at 247. Here, the jury was not provided that context. But even if the jury had heard that explanation, it would not change our view of the case because the opinion would still be solely based on the complainant's statements, and any diagnosis from an expert witness may be viewed by the jury as a "stamp of approval."

[6] To be clear, where there are no physical findings a physician may not testify that the complainant suffered "possible pediatric sexual abuse" or other phrases indicating a conclusion as to the likelihood that such abuse actually occurred. At the same time, however, a medical expert may offer the opinion that a lack of physical findings does not affirmatively establish that no abuse occurred.

convictions are a valid measure of the truth. The article admits as much by acknowledging that "since the examiner testified in court in 34 of the cases in which the perpetrator was convicted following a jury trial, it is possible that *testimony concerning medical findings contributed to the conviction*." *Id.* at 315 (emphasis added). Given that the article notes that it "is possible that testimony concerning medical findings contributed to the conviction," it seems likely that testimony concerning a "diagnosis" would further contribute to the conviction, especially, as in this case, when there are no physical findings to be found. *Id.* In many respects, relying on the article in this manner is akin to offering into evidence conviction rates to establish that those charged with crimes will "probably" be convicted.

We conclude that the article is clearly directed toward making a "diagnosis" on the basis of " 'proof' *before* proceeding with criminal charges" and does not support a "diagnosis" of pediatric sexual abuse at trial. *Id.* at 317 (emphasis added). The article only once refers to the term "diagnosis" and only does so by placing the term in scare quotes, which are "used to express esp. skepticism or derision concerning the use of the enclosed word or phrase." *Merriam-Webster's Collegiate Dictionary* (11th ed). In other words, the term "diagnosis" is not being used in its traditional sense. This makes sense, as even Dr. Simms herself explained that the purpose of the "diagnosis" was "to allow pediatricians that do child abuse evaluations to communicate with one another effectively . . . ."

Rather, the article is directed at pediatricians who must make referrals of possible sexual abuse and to inform prosecutors that the absence of medical "findings" does not mean that the complainant did not suffer sexual abuse. This This reading of the article not only makes sense but is consistent with Michigan law and likely the law of every other state. Indeed, the Michigan Legislature set a very low bar for triggering a report of sexual abuse, requiring a report if one only "has reasonable cause to suspect child abuse or child neglect . . . ." MCL 722.623(1)(a). [*Thorpe*, 504 Mich at 265 n 65.]

*Harbison* thus recognized that a "diagnosis" of sexual abuse absent physical findings is a term of art and has no probative value at trial. That the Court spoke disapprovingly of such diagnoses without qualification supports our conclusion that a diagnosis of possible pediatric sexual abuse is also inadmissible without corroborating physical findings. And in this case, Dr. Simms expressly referenced the article discussed in *Harbison*, thus compounding the initial error of introducing her diagnosis into evidence. See *id*. at 265.

In sum, we conclude that the admission of Dr. Simms's testimony that AC suffered possible pediatric sexual abuse was plain error as it was contrary to *Smith* and *Harbison*.[7] We further

---

[7] The defendant in *Harbison* did not object to Simms's testimony and the Supreme Court unanimously held that its admission was plain error under *Smith*. We see no reason to reach a different conclusion. Moreover, reversal is merited under *Harbison* even though it was decided after the verdict in this case as defendant raised the issue on appeal. At a minimum, *Harbison* should be given limited retroactive effect. See *People v Quinn*, 305 Mich App 484, 490; 853 NW2d 383 (2014).

conclude that this error affected defendant's substantial rights. The present case was a credibility contest. The testimony of the prosecution's other witnesses did not corroborate AC's testimony that defendant repeatedly had sexual intercourse with her while she was between the ages of 12 and 14. Defendant testified that he never touched AC in a sexual manner and that he never touched her vagina. His testimony was supported by AC's mother and sister who testified that they did not witness anything inappropriate between defendant and AC and offered negative opinions regarding AC's character for truthfulness. Because Dr. Simms testified that she was board-certified in child abuse pediatrics, had "lots" of years of experience, was the child abuse pediatrician for the Center for Child Protection and Ottawa County Children's Advocacy, and had been qualified as an expert in 37 counties in Michigan, the introduction of her diagnosis undermined the reliability of the verdict. See *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). For the same reasons stated by the Supreme Court in *Harbison*, we also conclude that Dr. Simms's testimony seriously affected the integrity of defendant's trial. An opinion from Dr. Simms as to whether AC was sexually abused not only had the effect of vouching for the AC's credibility, but it also invaded the province of the jury to determine whether defendant sexually abused the victim. Therefore, admission of that testimony was not a mere evidentiary error. *Thorpe*, 504 Mich at 264-265.

Reversed and remanded. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Jane M. Beckering

-11-